FILED
2017 Jan-05 PM 01:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


ROBERT FIELDER, ET AL,                    2:15-CV-1831-MHH

          PLAINTIFFS,

          V.

OCWEN LOAN SERVICING, LLC,        September 27, 2016
WESTERN UNION BUSINESS            Birmingham, Alabama
SOLUTIONS, LLC                    10:30 a.m.

          DEFENDANTS.

* * * * * * * * * * * * * * * * * * * * * * * * * * *


REPORTER'S OFFICIAL TRANSCRIPT OF
TELEPHONIC CONFERENCE


BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

Julie A. Martin, RMR, CRR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
1                              * * * * *

2                        A P P E A R A N C E S

3                              * * * * *

4    FOR THE PLAINTIFFS:

5    John E. Norris
     D. Frank Davis
6    Wesley W. Barnett
     DAVIS & NORRIS LLP
7    2154 Highland Avenue South
     Birmingham, Alabama  35205
8

9    FOR THE DEFENDANT OCWEN:

10   Robert J. Campbell
     Michael R. Pennington
11   BRADLEY, ARANT, BOULT & CUMMINGS, LLP
     1819 5th Avenue North
12   Birmingham, Alabama

13   FOR THE DEFENDANT WESTERN UNION:

14   John W. Scott
     SCOTT, DUKES & GEISLER
15   211 22nd Street North
     Birmingham, Alabama
16
     Susan H. Boyles
17   Daniel R. Taylor, Jr.
     KIRKPATRICK, TOWNSEND & STOCKTON
18   1001 West 4th Street
     Winston-Salem, North Carolina
19

20

21

22

23

24

25
```

```
 1                         * * * * *

 2                 P R O C E E D I N G S

 3                         * * * * *

 4          THE COURT:  Good morning.  We're here in case

 5   15-1831.  This is McWhorter versus Ocwen Loan Servicing.  I

 6   have a court reporter here, so let's begin by having everyone

 7   introduce themselves for the record, please.  Let's start with

 8   plaintiff's counsel.

 9          MR. NORRIS:  Your Honor, this is Johnny Norris

10   representing the plaintiff.  Also in the conference room with

11   the call are Wes Barnett and Frank Davis.

12          THE COURT:  Thank you, Mr. Norris.

13          MR. CAMPBELL:  This is Robert Campbell from Bradley

14   Arant for Ocwen.  I also have Mike Pennington on the line with

15   me.

16          MR. PENNINGTON:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. SCOTT:  Your Honor, this is John Scott for

19   Western Union.

20          MS. BOYLES:  Your Honor, also for Western Union are

21   Susan Boyles and Dan Taylor.

22          THE COURT:  All right.  Very good.  Thank you.  The

23   Court scheduled this telephone conference to talk about the

24   pending motions to dismiss in this case.  The Court has

25   reviewed the parties' briefing regarding the motions to
```

1    dismiss.  I have also done some research myself trying to

2    understand the specific points in the FDCPA that bear upon the

3    claims that Mr. McWhorter and Mr. Fielder have.

4          And based particularly on an Eleventh Circuit

5    decision that has helped me understand the statutory

6    framework -- that's the Schlosser opinion.  It's at 323 F.3d

7    534.  It's a Seventh Circuit opinion from 2003 -- I am inclined

8    to grant the motions to dismiss, so I wanted to give you all

9    that background but give you the opportunity, particularly

10   plaintiffs' counsel, to persuade me that I'm off track and that

11   I need to rethink that.

12         So with that said, if the defendants want to say

13   anything to build upon what they have presented in their

14   briefs, they certainly are welcome to, but otherwise I will

15   hear from plaintiffs' counsel.

16         MR. NORRIS:  Your Honor, Johnny Norris again for the

17   record.  And just so that I understand, when you sent out the

18   order setting up this telephone conference, you asked us to

19   focus on the issues relating to the particular claims of

20   Mr. Fielder and Mr. McWhorter.  The Court just told us that

21   you're inclined to grant the motions to dismiss with regard to

22   Ocwen.

23         Is that based upon the particular circumstances of

24   those two gentlemen or is it based upon the merits of our claim

25   that the fee violates the FDCPA?  That might help me focus my

1    argument.

2         THE COURT:  It is more the standing issue.  It's a

3    12(b)(1) analysis having to do with subject matter jurisdiction

4    and standing as it relates to these two particular plaintiffs.

5         What I focused on is what is a debt under the FDCPA

6    and who is a debt collector.  And if I go to the language in

7    the Schlosser opinion that I think is particularly helpful --

8    and give me one second, please.  I have a stack of papers here,

9    and I keep shifting around.

10        So this is what the Eleventh Circuit said in

11   Schlosser:  "As the district court recognized, the FDCPA

12   distinguishes between debt collectors and creditors.  Creditors

13   who generally are restrained by the desire to protect their

14   goodwill when collecting past due accounts" -- this is a quote

15   from the senate report on the FDCPA -- "are not covered by the

16   Act."

17        "Instead the Act is aimed at debt collectors who may

18   have no future contact with the consumer and are often

19   unconcerned with the consumer's opinion of them.  In general, a

20   creditor is broadly defined as one who offers or extends credit

21   creating a debt to whom a debt is owed; whereas a debt

22   collector is one who attempts to collect debts owed or due or

23   asserted to be owed or due another."

24        "For purposes of applying the FDCPA to a particular

25   debt, these two categories, debt collectors and creditors, are

1    mutually exclusive.  However, for debts that do not originate

2    with the one attempting collection but are acquired from

3    another, the collection activity related to that debt could

4    logically fall into either category."

5         "If the one who acquired the debt continues to

6    service it, it is acting much like the original creditor that

7    created the debt.  On the other hand, if it simply acquires the

8    debt for collection, it is acting more like a debt collector."

9         And then the Seventh Circuit talks about the specific

10   language of 15, U.S. Code, Section 1692(a) and says, "In other

11   words, the Act treats assignees as debt collectors if the debt

12   sought to be collected was in default when acquired by the

13   assignee and as creditors if it was not."

14        Particularly with respect to Mr. McWhorter, I think

15   that language sheds a lot of light on the situation.  It also

16   helps me understand the situation with respect to Mr. Fielder.

17   And his situation is amplified by the fact that his personal

18   liability on his debt was discharged in bankruptcy, and so the

19   payments that he currently is making -- or excuse me -- that

20   the Fielders are making to maintain their residence in the

21   house appear to the Court to be voluntary payments, and I'm not

22   sure exactly what the arrangement is that Mr. Fielder has that

23   allows him to maintain his possession of the house, but this

24   does not seem to be an arrangement that the FDCPA reaches both

25   because Ocwen is just processing monthly payments, is not

1   attempting to collect the debt, and because Mr. Fielder has no

2   personal liability in light of the bankruptcy discharge.

3           So, if that helps, that's where the Court stands in

4   light of its current evaluation of the briefing and the case

5   law.

6           MR. NORRIS:  Sure.  Your Honor, Johnny Norris again

7   for the benefit of the court reporter.  Let me make a number of

8   points with regard to what the Court just told me.

9           The first is -- and you started off this hearing,

10  Your Honor, by talking about this being a matter of subject

11  matter jurisdiction.  I think that some of that notion relates

12  to the footnote eight that is contained in Ocwen's brief in

13  support of its motion to dismiss when it talks about how

14  reference to the affidavits and documents and things that it

15  has submitted to the Court in connection with its motion, that

16  those things do not require the conversion of the Rule 12

17  motion to one for Rule 56 where you would have discovery and

18  then you might get some answers to some of the questions that

19  you're struggling with, and particularly with regard to

20  Mr. Fielder in terms of what activities are taking place on his

21  account, although I will tell you about that in just a minute.

22          But from a procedural standpoint, the defendant Ocwen

23  is incorrect.  The only subject matter jurisdiction argument

24  they have raised, which we have responded to in our brief, is

25  that they have some recordings of these two gentlemen who are

1  not legally sophisticated and who were asked questions like is

2  your account represented by a lawyer, and they said no,

3  basically because they wanted to get some information and

4  because they didn't understand that they were being asked

5  whether you have a lawyer representing you with regard to a

6  claim against Ocwen.  That is a subject matter jurisdiction

7  argument.  Frankly, I think it's completely meritless.  We've

8  briefed that.

9       But the question of whether these two gentlemen --

10  whether Ocwen is a debt collector with regard to Mr. McWhorter

11  and Mr. Fielder is a question of whether they have stated a

12  claim under Rule 12(b)(6).  It's a question of whether their

13  claim is viable under the law, not a question of whether the

14  Court has subject matter jurisdiction.  It is not a question of

15  Article III standing in the sense is there an actual dispute,

16  is there something in controversy the Court can decide.

17       So from a procedural standpoint, I think that their

18  argument I think that their argument in footnote eight where

19  they cite a case called Todd versus -- I'm sorry.  They cite a

20  case called Lawrence, which I don't see the original site, but

21  it's 919 F.2d at 1528 through 29, where they suggest to the

22  Court that matters outside the pleadings, such as testimony and

23  affidavits, may be considered and addressed in such challenges.

24  That was in a 12(b)(1) case situation that that language came

25  from.  It applies only to subject matter jurisdiction.

1         And insofar as the Court is faced with the question

2    of whether Ocwen is a debt collector with regard to these two

3    gentlemen, that is not a question of subject matter

4    jurisdiction.  It's a question of whether they have stated a

5    claim.

6         Now, Your Honor, with regard to Fielder, asked the

7    question, well, what have they done with regard to trying to

8    collect things from this gentleman.  Well, if this was

9    converted to a Rule 56, I would submit as part of my evidence a

10   document that I'm holding in my hand that's dated last week,

11   September 19th of 2016.

12        It is a loan reinstatement quote sent by Ocwen to

13   Robert Earl Fielder, the plaintiff.  And it says, "If the loan

14   is not reinstated, Mr. Fielder is bound by the way and payments

15   fall further behind, we may refer the mortgage to foreclosure

16   or, if the loan is already in foreclosure, we may continue with

17   foreclosure proceedings."

18        Well, the context of Mr. Fielder, just to make sure

19   that the debt collection -- the debt collector question that

20   Your Honor has raised, first of all, Ocwen does not argue

21   because it cannot that it does not have at least, as a

22   substantial part of its business, the collection of debts owed

23   to another, because that's -- most of its portfolio was

24   acquired loans that were in default.  Ocwen does not argue

25   otherwise.

1          They now argue that Mr. Fielder -- we have alleged in

2    the complaint that Mr. Fielder's loan was in default at the

3    time that Ocwen took it over.  They are not making any argument

4    that that's not true.  It simply is true.

5          So then the next question is what -- the things that

6    they are doing with regard to Mr. Fielder in accepting payment

7    and sending out things like this loan reinstatement quote from

8    last week, the affidavit that they submitted, by the way,

9    indicates that they send out regular memorandums like this,

10   informational memorandums, that tell him what his balance is,

11   how much he owes and the consequences if he doesn't pay, which

12   this is now a non-recourse loan that comes to Mr. Fielder.  His

13   personal liability has been stripped out, but if he wants to

14   keep the house, he has to continue making the payments, and

15   they are constantly reminding him of that.

16          Now --

17          THE COURT:  Mr. Norris, let me stop you for just a

18   second, because I want to make sure that I'm following the

19   parties' arguments well, and maybe I'm getting confused.  But

20   with respect to Mr. Fielder, I thought the situation in his

21   instance was that when Ocwen acquired his loan he had been

22   given a trial period to see if he could make some revised

23   payments on his mortgage.  He had successfully made three of

24   those payments.  And so Ocwen was going to be taking over his

25   loan and servicing his loan under a revised payment schedule.

1    And I understand that the plaintiffs' argument is

2  that Mr. Fielder was in default because he was behind a

3  significant amount under the payment schedule that he had

4  before there had been this renegotiation and the trial period.

5  But I go back to the language of Schlosser.  And if, at the

6  time Ocwen acquired that loan, it was acquiring it to service

7  it going forward as a routine servicing agent of the creditor,

8  then under the rationale of the statute, the legislative

9  history and the direction that the Court receives from that

10  Seventh Circuit opinion, it would appear that Ocwen is not a

11  debt collector with respect to Mr. Fielder.

12    Now, help me understand whether I am --

13    MR. NORRIS:  Judge, it is apparent to me, and I

14  apologize to you and for my opponent that the parties have done

15  a poor job of briefing this.  The facts that you just recited

16  are the facts related to Mr. McWhorter.

17    THE COURT:  I'm sorry.  I may be getting the two

18  plaintiffs confused.  I apologize.

19    MR. NORRIS:  It is undisputed, Judge, that when Ocwen

20  took over Mr. Fielder's loan that it was default, and they do

21  not argue otherwise.  The factual circumstances you just set

22  forth are the circumstances concerning Mr. McWhorter, who I

23  will get to in a minute.

24    THE COURT:  So Mr. Fielder then was the gentleman who

25  was discharged from bankruptcy?

1    MR. NORRIS:  Mr. Fielder was -- here's what happened

2  with Mr. Fielder:  They took over his loan.  His loan itself

3  was, insofar as his personal liability, was discharged, but the

4  loan remained attached to the mortgage.  So Mr. Fielder is

5  still living in the house.  And so if he fails to make

6  payments, the consequences, as they made clear in a letter to

7  him last week, is that they will foreclose on his house and

8  take away his house.

9    Now, the only thing that the bankruptcy discharge did

10  insofar as Mr. Fielder is concerned is that if they foreclose

11  on the house and sell the house at auction and that there is

12  then a deficiency, they cannot come back against Mr. Fielder

13  for the deficiency because his personal liability has been

14  discharged.  But the bankruptcy left the loan unaffected

15  insofar as it was attached to the mortgage on the house that

16  Mr. Fielder still lives in and would like to continue to live

17  in.

18    THE COURT:  Right.  So that goes to the point that I

19  made at the beginning of the discussion, and I apologize for

20  confusing the names of the two plaintiffs.  But with respect to

21  Mr. Fielder then, the payments that he is making are not

22  pursuant to an obligation to pay money.  The bankruptcy

23  discharge eliminated his obligation to pay the money.  If he is

24  making those payments voluntarily under whatever arrangement he

25  has right now, that's his choice.

1          But with respect to the FDCPA, he is making voluntary

2    payments with no contractual obligation.  That contractual

3    obligation was alleviated by the bankruptcy court.  And for now

4    at least, Ocwen has just been acting as a collector of the

5    monthly amounts that he is supposed to pay.

6          MR. NORRIS:  Your Honor, since this case was briefed,

7    there's been a couple of cases that have come out, and both of

8    these cases are in the Middle District of Florida which is, of

9    course, in the Eleventh Circuit.

10          THE COURT:  Okay.

11          MR. NORRIS:  And these cases address this exact

12    issue.  The one that is most nearly on point is called Roth

13    versus Nationstar Mortgage.  It came out in July of this year,

14    just a couple of months ago.  The citation to that case is

15    2016, and this is a Westlaw citation, 2016 WL 3570991.

16          THE COURT:  Okay.

17          MR. NORRIS:  And in that case, Your Honor, the

18    plaintiff had this exact same situation occur.  And the

19    situation was she had a loan that Nationstar was servicing.

20    Nationstar had gotten her loan after it was in default.  She

21    declared bankruptcy.  The bankruptcy got rid of her personal

22    liability on the note, but left it attached to the mortgage,

23    and she stayed in the house.

24          Following that, Nationstar started sending

25    communications that were called -- that are called

1   informational things, same exact sort of communications that,

2   according to the affidavit that Ocwen has submitted from its

3   employee, that my client is receiving from them on a monthly

4   basis, including this one I've got in my hand from 9/19, just

5   last week.

6          And the case said, well, the question here is is this

7   communication that is being directed, is it a communication

8   that is related to debt collection, and it says this:  "Not all

9   communications that a creditor sends a debtor regarding a

10  discharged debt are, quote, 'related to debt collection,'

11  close quote.  Although, the FDCPA does not expressly set forth

12  what constitutes collection-related activity, the Eleventh

13  Circuit has held that if a communication conveys information

14  about a debt and it's aimed, at least in part, to induce the

15  debtor to pay, it falls within the scope of the Act."

16         And, Judge, they cite to an Eleventh Circuit case.

17  It's called Caceres, C-A-C-E-R-E-S, versus McCalla, and that's

18  reported at 755 F.3d 1299, and it cites also a Second Circuit

19  case.

20         And then the Court goes on in this Roth case and

21  says, "Stated differently, a communication coming within the

22  purview of the FDCPA where it is made with, quote, 'an

23  animating purpose of inducing payment by the debtor,'"close

24  quote.

25         Then it goes on to say, "The issue of whether a

1    particular communication's animating purpose is to induce a

2    debtor to pay is determined through the eyes of the least

3    sophisticated consumer."

4              And then it goes on, and it says, "Turning to the

5    informational statement" -- the thing the plaintiff in that

6    case had been receiving from Nationstar -- "turning to the

7    information statement at issue, the Court is convinced that the

8    complaint sufficiently alleges that the statement constitutes

9    an attempt to collect a debt.  Viewing the cumulative effect of

10   the statement's language in the perspective of the least

11   sophisticated consumer, it is, in fact, difficult to conceive

12   of any credible reason for Nationstar to send the informational

13   statement other than to pressure plaintiff into making payments

14   on the mortgage debt, for which her personal liability had been

15   discharged."  Those are quotes, Your Honor.

16             In another case that involved Ocwen itself, this case

17   -- well, before I finish, there's a similar case, Your Honor,

18   to the one I just read.  It has all the same quotes.  I'm not

19   going to read those to you.  It was decided on July the 28th of

20   this year.  It's called Galle, G-A-L-L-E, versus Nationstar.

21   It's also a Nationstar case, and it's reported at 2016 WL

22   4063274.

23             Now, also -- well, actually, I guess just a few days

24   before we filed our brief in this case, there was another

25   decision.  This one was decided by the Second Circuit Court of

1    Appeals, and it involves Ocwen.  And this case is called

2    Garfield versus Ocwen.  It's a January 4th case from this year,

3    and it's reported at 811 F.3d 86.

4         And in that case, Judge, it's the exact same

5    circumstances as this.  The debtor, who was -- and in this

6    circumstance, it was undisputed that Ocwen was a debt collector

7    with regard to this loan.  This particular person went into

8    bankruptcy and had the loan stripped out the same way where the

9    personal liability was gone, and Ocwen continued to try to

10   collect the amount.  And it turns out in this circumstance,

11   they did this while the individual was still in bankruptcy

12   where the automatic stay was in effect.

13        And the question that went to the Second Circuit was

14   not the issue that Ocwen is arguing here.  The question in the

15   Second Circuit -- and they won in the district court, and the

16   district court's dismissal was reversed by the Second Circuit.

17   The argument they were making is that the bankruptcy code,

18   since this was an ongoing bankruptcy, that the provisions of

19   the bankruptcy code preempted the FDCPA's protections on debt

20   collector activity.  And unrelated to the issues in this case,

21   the Second Circuit disagreed with the district court's

22   determination that there was bankruptcy code preemption.

23        But the telling point, Judge, is this woman was in

24   the exact same circumstance with Ocwen.  Ocwen didn't even

25   raise that issue.  Ocwen could have won the case, if the law

1    was as Ocwen believes it is, and as I think these Middle

2    District of Florida cases clearly say it is not the law, that

3    you can collect the money.  You can send informational

4    statements.  You can charge illegal fees as long as there's a

5    non-recourse liability and there's no personal liability for a

6    deficiency.

7            If that was the law, they would have raised this

8    issue.  And if they were correct, which I don't think they are,

9    they might have prevailed in the district court on that issue.

10   They didn't raise that in district court.  And they might have

11   prevailed in the Second Circuit, and the Second Circuit might

12   not have even had to get to the bankruptcy preemption issue,

13   but it did, and Ocwen was held liable.  The dismissal was

14   reversed, and it went back down to the district court in New

15   York after the opinion.

16           I guess basically philosophically, Judge, what the

17   Eleventh Circuit District Courts have said, citing to Eleventh

18   Circuit law, is that the issue is Mr. Fielder is sitting there,

19   he has a house.  The statutory language says that you have --

20   the statutory language speaks of if you have an obligation.  It

21   doesn't say a debt.  It doesn't say you have to be personally

22   liable.  It doesn't say anything like that.  All it says is you

23   have to either be obligated to pay or allegedly obligated to

24   pay an obligation.

25           Well, if you've got your family in a home and you

1  would like to keep that home and the company is sending you

2  statements that say, if you want to keep your home, then these

3  are the payments you need to make, to me that is the very

4  quintessence of debt collection because, while he may not be

5  personally liable, in other words, a personal judgment against

6  him to get to his other assets cannot be entered, nevertheless,

7  Mr. Fielder has got an obligation to pay this money and the

8  consequence if he doesn't pay this obligation is that he loses

9  his house and is going to have to find a different place to

10  live for him and his family.

11        So I think if you look at this technically and

12  realistically, that I can follow, I think, where Your Honor

13  started off this discussion.  But if you look at the fact that

14  the cases have said that you've got to look at this from a

15  standpoint of the least sophisticated consumer, you really

16  can't get hung up on the realistic or formalistic idea that he

17  is not technically personally liable when, in the very real

18  world, the consequence of him not making these payments is to

19  lose his home.

20        THE COURT:  Well, let me ask you this, Mr. Norris,

21  because -- and I realize we're going somewhat afield from the

22  Rule 12(b) context, but to help me understand, the FDCPA

23  defines debt, and I think you summarized this nicely, as any

24  obligation or alleged obligation of a consumer to pay money.

25  And that is at Section 1692(a)(5).

1          So, what you're arguing to the Court is that

2    Mr. Fielder has an obligation to his family to maintain

3    whatever payments Ocwen requests of him so that they can retain

4    their occupancy of the house; but, as you pointed out, it's

5    undisputed that Mr. Fielder defaulted and then was excused from

6    the personal liability on the loan.

7          And don't mistake the Court's attempt to read the

8    statute and the plain language of the statute and enforce it as

9    any lack of sympathy for the situation in which Mr. Fielder

10   finds himself but, under the statute, it still appears to the

11   Court that a family obligation is not the type of obligation

12   that the statute speaks to.

13         And while I recognize the argument that you're making

14   with respect to interpreting the statute keeping in mind the

15   least sophisticated consumer, it still appears that a family

16   obligation is distinct from the legal obligation that I think

17   the FDCPA is attempting to capture.

18         MR. NORRIS:  Judge, let me give you a hypothetical,

19   and I will tell you there's cases like this.  I was discussing

20   this with my partner yesterday.  It is clearly illegal, if I've

21   got a daughter who has a home and she falls behind on her

22   mortgage, it is clearly illegal for the mortgage company to

23   contact me, the father, and attempt to get me to pay it on her

24   behalf, but I might do it.

25         That's clearly -- if they're alleging that I have an

1    obligation to do this, maybe I have a moral obligation, maybe I

2    have a familial obligation, but it's an obligation, but there

3    are any number of FDCPA cases that says you can't do that.

4    This relates -- there is a debt, Your Honor.  It may not -- and

5    the debt, the nature of the debt has changed.  The nature of

6    the debt from a legal standpoint is that before the bankruptcy

7    he was both personally liable and the ownership of his home was

8    contingent on it.

9            After the bankruptcy, the debt remains.  There is

10   still a debt.  It's just that Ocwen's ability to enforce its

11   rights to payment under that debt is limited to the home, and

12   they can't get a deficiency judgment against Mr. Fielder.

13           To me, and I think these cases that I've cited to

14   you -- and I will get those over there to you today so you

15   don't have to hunt around on Westlaw for them yourself -- is

16   that the law, as it has been interpreted by these cases, is

17   that if there's an obligation, in other words, you have a legal

18   obligation to pay it and it's not just a duty to his family,

19   Your Honor, it is a duty for his personal ownership.  This

20   gentleman owns a piece of real estate.  Okay.

21           And if he makes the payments pursuant to the debt

22   that exists, all the way to the end, then he will own a piece

23   of property.  If on the other hand, he defaults on this and

24   defaults sufficiently so that Ocwen decides that what it's

25   going to do is to foreclose on the mortgage, then he's going to

1    lose that piece of property that belongs to him.  It is his

2    property.  It's not just an obligation to his family.

3        And when you exist under the threat of having

4    something taken away from you, a piece of property that you

5    have legal title to, that is an obligation within the meaning

6    of the statute, and I think the cases I've cited to Your Honor

7    make that very clear.

8        THE COURT:  Well, that's what I was asking early on.

9    That's the piece of this that isn't entirely clear to me.  I

10   don't understand what the current relationship is between

11   Mr. Fielder and Ocwen.  The way I was reading things, it seemed

12   to me more that this was essentially a lessor/lessee

13   relationship, and that Mr. Fielder had already lost the benefit

14   of whatever he had paid up until the time the loan went into

15   default, and that Ocwen was in a position where it could

16   foreclose whenever it wished to, but it had made some sort of

17   arrangement with Mr. Fielder pursuant to which, if Mr. Fielder

18   made whatever the payment amount was, he could for that month

19   maintain the occupancy of the house.

20       So what you're telling me, Mr. Norris, it sounds like

21   is that the legal arrangement that allows Mr. Fielder to stay

22   in the house is something other than what I was envisioning and

23   that he still will have the benefit, if he makes all of these

24   payments as scheduled, to obtain full, complete ownership of

25   the house debt free once all of the payments are made?

1          MR. NORRIS:  That is our understanding, Your Honor,

2     and I would like to say two things about that.  If Your Honor

3     is continuing to -- if it's the Court's intention to rule on

4     the Rule 12(b)(6) motion with all the attachments, I would like

5     permission to send to you an example of what they've been

6     sending Mr. Fielder this loan reinstatement quote, which he got

7     just last week.

8          But I think that -- procedurally, I think that we may

9     be identifying, as you and I talk through this, the real need

10     for the Court to allow discovery to take place with regard to

11     Mr. Fielder and Mr. McWhorter, who is in a different situation,

12     so that the Court is not left to speculate about what is

13     actually going on between these parties.

14          So what I would like for the Court to do and urge the

15     Court to do is to either convert this motion to a Rule 56

16     motion and allow us a reasonable time to take discovery on

17     these issues or to simply deny it without prejudice to the

18     defendant's right to later file a Rule 56 motion on these same

19     issues.

20          But what I've been describing to you is what I

21     understand, Judge -- and I haven't seen all the documentation.

22     I haven't seen everything.  I've only seen what the defendant

23     has chosen to file in terms of evidence in support of its

24     motion.  But based on my conversations with my client, this

25     thing that came in last week and what Mr. Hawkins, I think is

1  his name, in his affidavit stated, my understanding is that the

2  relationship is exactly that, that the loan itself remains

3  untouched.  The only thing that changed was to limit Ocwen's

4  recourse on the loan to seizing the property if payments are

5  not timely made.  That is my understanding.

6          THE COURT:  Okay.  Let me give counsel for Ocwen an

7  opportunity to respond with respect to Mr. Fielder.

8          MR. CAMPBELL:  Yes, Your Honor.

9          MR. PENNINGTON:  Yes, Your Honor.  Rob, let me say

10 this.

11          THE COURT:  Hold on one second, please.  All the

12 sudden it became very garbled.  Who is speaking, please?

13          MR. PENNINGTON:  Okay.  This is Mike Pennington, Your

14 Honor.  Can you hear me?

15          THE COURT:  Yes, sir.

16          MR. PENNINGTON:  Okay.  Your Honor, I apologize.  Bob

17 Campbell and I are in different locations.  I'm in an airport,

18 and Bob will respond for the most part, but I did want to

19 clarify the question the judge just asked.

20          The arrangement between Ocwen and the discharged

21 debtor is simply this:  A debtor desiring to file bankruptcy

22 has some choices.  They can file for Chapter 13 and try to

23 reorganize their debt and file a Chapter 13 plan that brings

24 the loan current, keeps the house and file a Chapter 7, which

25 they can then reaffirm the debt on the house, or they can say

1  I'm going to surrender the property, and I want a Chapter 7

2  discharge.

3          Mr. Fielder chose the latter.  He received a Chapter

4  7 discharge.  A Chapter 7 discharge by itself was not the

5  best --

6          THE COURT REPORTER:  I'm having a hard time

7  understanding.

8          MR. PENNINGTON:  And rather than surrendering the

9  property, Mr. Fielder has chosen to stay in.  And it leaves

10  Ocwen with two choices.  One, it can foreclose on the property;

11  or, pursuant to 524(j) of the bankruptcy code, it can choose to

12  offer the debtor, Mr. McWhorter or Mr. Fielder, the option of

13  making payments in lieu of foreclosure.  And Mr. Fielder has

14  pursued that option with Ocwen, and that's where the issue in

15  this case has come up.

16          Mr. Fielder, in an effort to make monthly payments,

17  if he's less than 90 days behind, so as to avoid foreclose, has

18  chosen speed pay to try to get that done, because he hasn't

19  been able to make payments sufficient to keep him out of

20  foreclosure otherwise.  And so that's what led to the payments

21  here.

22          There is no lease arrangement.  There's no other

23  arrangement other than what is provided for in 524(j) of the

24  bankruptcy code.  It allows Ocwen to accept payments in lieu of

25  foreclosure for discharging the debtor.  And that's the only

1    thing that it is.  And having said that, Rob will respond to

2    the other issue.

3              MR. CAMPBELL:  Thank you, Your Honor.  I'll be brief.

4    Just to step back two steps in addressing Johnny's points,

5    first, I do think it is properly considered under a 12(b)(1)

6    standard.  As we note in footnote eight in our motion to

7    dismiss, we cited the Johnson versus Ocwen Loan Servicing case.

8    This is an Eleventh Circuit decision.  It's 374 Federal

9    Appendix 868.  The pinpoint cite is on Page 873-74.

10             The issue of whether a plaintiff can satisfy the

11   threshold showing under the FDCPA that he's a consumer and to

12   properly bring a claim against a debt collector, it is under

13   credential standard considerations.  And in that case, the

14   Court addressed Article III and credential standing under that

15   framework.

16             So I think Your Honor has already went about

17   this actually not being a standing argument doesn't track what

18   the Eleventh Circuit's --

19             THE CLERK:  Sir, this is Tammi, Judge's courtroom

20   deputy.  She had to step away for just one second.  Can you

21   hold just one second?

22             MR. CAMPBELL:  Okay.

23             (Brief pause)

24             THE COURT:  I apologize.  You all can go ahead.

25   Judge Hancock just walked in for a minute, so I was saying hi

1  to him.

2          MR. CAMPBELL:  I'm not sure which part was missed.

3  Do I need to repeat anything?

4          THE COURT:  No, go ahead.  You're fine.

5          MR. CAMPBELL:  Okay.  So the other -- the second

6  point I wanted to make was we haven't heard anything about

7  Mr. McWhorter.  Mr. Norris has mentioned a couple of things

8  about Mr. Fielder.  We haven't heard about Mr. McWhorter.

9          THE COURT:  Let's just stick with Mr. Fielder for

10 right now, and we'll switch gears to Mr. McWhorter in a second.

11         MR. CAMPBELL:  Sure.

12         THE COURT:  So listening to Mr. Norris' argument, it

13 seems that the Court has to make sure it has a full

14 understanding of what constitutes an obligation under the

15 FDCPA.

16         Mr. Norris' argument is that the current relationship

17 that Mr. Fielder has with Ocwen is sufficient to create an

18 obligation within the meaning of that term under the FDCPA.

19 And Ocwen's position, the Court assumes, is that the current

20 arrangement that Mr. Fielder has with Ocwen is not an

21 obligation under the FDCPA; is that fair?

22         MR. CAMPBELL:  Yes, Your Honor, and if I can add just

23 a bit to that.  The cases that the plaintiffs bring up today

24 are an apple to oranges comparison.  Neither case in which

25 courts have said in the context of post-discharge conduct a

1   plaintiff has alleged that they are being fraudulently pursued

2   for a discharge that --

3         MR. NORRIS:  That's not what we have here.

4         MR. CAMPBELL:  Well, Mr. Fielder readily admits that

5   his personal liability is discharged.  That's admitted in the

6   complaint.  This is a completely different claim.

7         What we have here is, as the Court noted, the

8   definition of what is a debt under 15, USC, 1692(a)(5) that a

9   debt is a consumer obligation.  I'm confident that if you look

10  at Mr. Fielder's actual stated cause of action here under 15,

11  USC, 1692(f)(1), it's a charge incidental to a debt.  Well, a

12  debt is defined again as an obligation of the consumer.

13  Mr. Fielder doesn't have any obligation here under any sort

14  that exposes a personal liability.

15        I believe the Court's original analysis from the

16  start of the call under the Schlosser decision is absolutely

17  correct.  The FDCPA is not meant to prevent foreclosures.  It's

18  meant to pursue people from coming after someone who has legal

19  liability.  Recourse can be sought against the person.

20  Mr. Fielder doesn't have that here.

21        And if he thinks that there's some sort of

22  post-discharge misconduct, he always has bankruptcy contempt,

23  but he's not alleging that.  What he's wanting to say is I was

24  discharged but, at the same time, I somehow remain sufficiently

25  liable under a debt that doesn't exist to invoke the

1    protections of FDCPA.  I don't see it making sense.

2         MR. NORRIS:  Judge --

3         MR. CAMPBELL:  There's two --

4         MR. NORRIS:  I'm sorry.

5         MR. CAMPBELL:  There's two cases I would point the

6    Court to in our briefing.

7         THE COURT:  Okay.

8         MR. CAMPBELL:  One is the Arruda versus Sears Roebuck

9    decision.  This is cited on --

10        THE COURT:  I have that right in front of me.  Ocwen

11   relied on that.

12        MR. CAMPBELL:  Okay.  And the Sullivan versus Ocwen

13   Loan Servicing case, which is cited in our motion to dismiss.

14        THE COURT:  Yes, sir.

15        MR. CAMPBELL:  There's an additional one, LaCourse

16   versus Ocwen Loan Servicing.  The cite for that is 2015 Westlaw

17   1565250.  The Sullivan and LaCourse collectively stand for the

18   proposition that Ocwen can't be a debt collector in a

19   post-discharge context when it's simply servicing the

20   undischarged mortgage.

21        The issue here is that if Mr. Fielder doesn't want --

22   if he wants to discontinue trying to satisfy the mortgage, he

23   can walk away, and Ocwen has no personal recourse against him.

24   All he is doing right now is trying to incrementally satisfy

25   the non-discharged lien, but there's no threat of recourse

1  against him personally.

2        MR. NORRIS:  Judge, I'm sorry, I didn't mean to

3  interrupt you.  I thought you were finished.

4        MR. CAMPBELL:  I'm finished.

5        MR. NORRIS:  Judge, if I could just say a couple of

6  things, and then I will stop talking about Mr. Fielder, but I

7  think they're important things.  My opposing counsel says the

8  debt does not exist.  It does exist.  And the best evidence of

9  that is that my client has got title to a piece of real estate

10  with a house on it.  And every time he makes a payment, it pays

11  down the principal that he owes on that house.  And so the debt

12  does exist.  There's just ample documentation of it, and

13  they're still sending him stuff saying that this communication

14  is from a debt collector and then here's a quote for

15  reinstating your loan.

16        The other thing I would say is that I have read, as I

17  am sure you have, all of their cases, and not a single case

18  that they cited to Your Honor involves this situation.  The

19  cases I just cited to you do.  In every one of those situations

20  they cited, there's a long footnote in their brief, and I can't

21  remember what number it is, but there's a string cite of all

22  these cases.

23        But the issue there was whether foreclosure activity,

24  in other words, the activity of going and seizing the home,

25  constitutes debt collection activity, and it clearly does not.

1  But those same cases, if you Shepardize them and read them and,

2  of course, we cited these to you in our brief, say that, well,

3  if you've got foreclosure activity but you've also got a

4  component of trying to get them to pay something to prevent

5  foreclosure, that is debt collection activity.

6          If I say to you, as they said to my client last week

7  in this September 19th, 2016, loan reinstatement quote, they

8  say if the loan is not reinstated and payments fall further

9  behind, we may refer the mortgage to foreclosure.  And so he's

10  got a piece of property.  He has title to the piece of

11  property.  And unlike their situations in every one of their

12  situations that they cited, there's not been an attempt to get

13  payment in lieu of foreclosure.

14          It is black letter law under the FDCPA that going out

15  and foreclosing on a mortgage, the activities related to the

16  foreclosure itself are not debt collection activity.  Where you

17  cross the line is exactly where Ocwen is, and it has crossed

18  the line by attempting to collect, as my opponent put it, in

19  attempting to collect the money in lieu of foreclosure.  That

20  is by definition debt collection activity.

21          THE COURT:  All right.

22          MR. CAMPBELL:  This is Rob Campbell.  I would like

23  the record to reflect that the reinstatement quote was

24  something you all asked for last week.

25          MR. PENNINGTON:  Your Honor, one other thing.  There

1  is -- this is Mike Pennington.  There's a pretty serious irony

2  going on here and that is this:  Rather than proceed directly

3  to foreclosure as was our right, we offered Mr. McWhorter the

4  option expressly allowed under 524(j) to try to keep him in his

5  home.

6          Johnny's position is that if we do that we make

7  ourselves subject to the FDCPA automatically always.  That's

8  not what the cases say, and that's not the context of this

9  case.  But it's an irony that he seeks to punish us for a

10 client who helped Mr. Fielder stay in the home.

11         And then he goes on to say that we offer a service

12 we're not required to offer in the course of doing that, the

13 opportunity for Mr. Fielder, who calls up on the last possible

14 day and says, look, I want to stay in my home, I want to make

15 another payment and stay out of foreclosure, is there anything

16 I can do.  If we offer a service and charge a fee for that,

17 even though Mr. Fielder is discharged, he says, well, now

18 you're collecting a fee incidental to a debt.

19         Again, this is not about us trying to chase

20 Mr. Fielder out of the home.  This is about Ocwen trying to do

21 -- trying to give Mr. Fielder the option for staying in his

22 home.  And plaintiffs' counsel is contending that by doing so

23 we're somehow engaging in the collection of a debt.  It's a

24 nonsensical claim, and it shouldn't be accepted.

25         THE COURT:  All right.  Mr. Norris, let's change

1   gears and talk about Mr. McWhorter, please.

2           MR. NORRIS:  Judge, McWhorter is a completely

3   different situation.  Mr. McWhorter was under these new

4   regulations that came out shortly after the great recession

5   started in 2008.  He was way behind on his loan.  And being way

6   behind on his loan, he was offered by the originator of the

7   mortgage, not Ocwen, what was called a HAMP loan modification,

8   but it was a temporary modification.

9           And so at the time that his loan was taken over his

10  situation was this:  He had a temporary loan modification.

11  That temporary loan modification required him to make payments,

12  which he made, but there had been no permanent modification

13  made.  In fact, the permanent modification was made after Ocwen

14  took it over.  And so until the moment that the permanent

15  modification was made, our contention is that he was still in

16  default on the original mortgage.

17          I will be honest with you, the case law on that point

18  is not very plentiful, but I don't think it changes the nature

19  of you've got -- you know, the FDCPA is limited to situations

20  where the debt collector took the loan over when it was in

21  default, a troubled loan, for purposes of collection.  And

22  regardless of whether he was trying to remedy that, the fact is

23  that Mr. McWhorter was in trouble.

24          And let me just say this, because they said that we

25  didn't say anything about this in our reply brief on this

1 point.  There was a subsequent loan modification made by Ocwen,

2 so there's a total of two loan modifications.  And, again,

3 there's scarce case law on this point, but it seems to us to be

4 the height of unfairness to take away the FDCPA -- for a

5 mortgage company or any other creditor to be able to enter into

6 a -- to basically escape the consumer protections that the

7 FDCPA affords to debtors to not have all of these abusive

8 collection practices directed against them, that all they have

9 to do to get out of that is just modify the loan and enter into

10 a new contract.

11       They don't cite any real authority for that

12 proposition.  I don't see the case law.  I don't see how a

13 modification gets rid of the fact that it's still the same

14 money that was lent to this gentleman by the first loan

15 originator, and he was behind under that original contract when

16 Ocwen took it over.

17       THE COURT:  Okay.  Any response from Ocwen on that

18 with respect to Mr. McWhorter?

19       MR. CAMPBELL:  Your Honor, I think it just goes right

20 back to the Schlosser case which the Court started out with.

21 I mean, Schlosser makes clear a debt collector certainly does

22 -- just focuses on collecting a debt.  A servicer goes out and

23 does more.  They try to keep people in their homes.  And as

24 Mike Pennington pointed out, that's what you do with a loan

25 mod.

1    I mean, here, when we acquired the debt, the trial

2   period was completed.  We were legally obligated to get him out

3   of the mod and we did so within days acquiring service rights

4   to the loan, which brought them current.  Then he asked for and

5   received another mod all before he ever raised a claim in this

6   case.  He was clearly current.

7    He was having difficulty.  He had been paying on

8   those, but the issue is that he kept asking for modifications,

9   and they were granted, and he was brought current each time,

10  and then continually Ocwen serviced the loan as modified.  It's

11  a Schlosser/Bailey situation.  This is much more than just debt

12  collection that's going on.

13    THE COURT:  Okay.  All right.  Mr. Norris, if you

14  want to, I'm happy to look up the Florida opinions or if you

15  want to email those to chambers, you're welcome to do it.

16    MR. NORRIS:  I always forget those chambers email,

17  Judge.

18    THE COURT:  Haikala_chambers@alnd.uscourts.gov.

19    MR. NORRIS:  Got it.  That's court singular; right?

20    THE COURT:  No, sir, with an S.

21    MR. NORRIS:  Courts.

22    THE COURT:  Yes, sir.

23    MR. NORRIS:  Okay.  Judge, I'm going to send you

24  that.  And then with your permission, I'm also going to send

25  you this loan reinstatement quote that I've been talking about

1   during the hearing.

2          THE COURT:  Okay.  Very good.  And please make sure

3   you copy all of counsel on that email.

4          MR. NORRIS:  Of course.

5          THE COURT:  All right.  Is there anything else the

6   parties would like to discuss this morning?

7          MR. NORRIS:  No, Your Honor, nothing from the

8   plaintiffs.

9          MR. PENNINGTON:  No, Your Honor.

10          THE COURT:  Thank you very much for your time.  Y'all

11   have a good day.

12          (Court adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

• 36

# C E R T I F I C A T E

**I hereby certify that the foregoing transcript in the above-styled cause is true and correct.**


**Date:  1/5/2017**


**Julie A. Martin, RMR, CRR**

**Federal Official Court Reporter**